Good morning, Your Honor. Jihan Thomas on behalf of Petitioner Ekawati Juliani. And I would like to reserve two minutes rebuttal time. Mrs. Juliani asked this court to find that her severe trauma, her major depression, her chronic post-traumatic stress disorders as effects of her persecution in Indonesia constitute extraordinary circumstances within the untimeliness of her asylum application under the regulations. Now, the facts in this case have been admitted and not in dispute. Mrs. Juliani has testified to both, to the court and to her psychologist, that the reason for her delay was her inability to come and talk about her past harms because she was not thinking well and her mind was out of control. Further, the report from Dr. Amy Wenzel confirms that it was admitted and it was not disputed. Are you suggesting that there are no disputed facts as it relates to this depression? That is correct, Your Honor, and we ask that this court has jurisdiction to hear this case. Well, I guess that's the worry that I have. It seems to me that even in determining what the depression is or what it isn't or how it relates to this, it may not be quite undisputed. One would suggest it means one thing and one would suggest it means another. Well, Your Honor, I believe the report clearly states and the facts that was established in the report that she was unable to function on her basic, on a daily basis, and interfered with all aspects of her life. And I believe these reviewable facts, you know, would ask this court to determine whether it satisfies the statutory standards. Okay, and so if we go on past there, she entered in October 1999, and she was authorized to stay until October 2000. She didn't file her application until July 2004. I guess I'm trying to figure out why that means we have extraordinary circumstances for that period of time. Because, Your Honor, the regulation allows when there is a mental disability as effects of her persecution. And I believe the doctor has said that she was suffering from severe episode of post-traumatic stress disorder. She was unable to function even on her basic function on the daily basis. And not only that, she filed for her asylum in 2004, yet she was unable to come forward and speak about her past harm. She canceled two asylum interviews in 2005 and 2006, and three years later from the filing of her asylum application, she just gained strength and came forward to talk about her experiences in May 2007. So that strengthened her claim that she was unable to come and speak about her past harm. And the report indicates she was unable to sleep. She lost her appetite. That interfered with her relationship with her husband. She became in social isolation. And I believe all these facts confirm that interfered with her. How does that affect with the Morozov versus Holder? Are you familiar with that case? Morozov case, the Morozov case versus Holder. In that case, there was no extraordinary circumstances found even where the petitioner testified that he attempted to fill out the application, but every time he did, so he became short of breath, began coughing, and lost his ability to talk. So there's some very serious, it sounds like, physical circumstances preventing him. I'm just trying to figure out how serious of a mental illness, because I think you can have a mental illness, but then you also have to show how serious it is. And I believe Dr. Wenzel's report suggested that the petitioner's condition very well may have affected her ability to file. I'm trying to figure out what to make of very well may have affected. I believe, Your Honor, my understanding of the word may have goes into the opinion of the doctor, but the fact that was concrete and is established that she was unable to actually, it interfered with her basic function, which went into her sleep, her appetite, her social life, and her intimacy with her husband. So these are very severe. We're looking at basic things that the person cannot do. So if she cannot function on the basic function, how could we expect her to come forward? And it's different from somebody who is unable to speak, because, you know, I think the mental disability and the trauma associated with the effects of the persecution even precluded her to come three years later from the filing of the asylum application. Okay. So if we don't agree, we understand your argument about this. And supposing we don't agree, well, then the asylum is gone. But supposing that we do that, you still have a withholding claim, right? That is correct. Why do we ought to change the withholding? It was interesting to me that when you went to the BIA and you were talking about what the BIA ought to do in this particular situation, that you didn't argue that they ought to send this case back to the IJ. You said the BIA could determine the case on the facts before it. In fact, I have in your brief, Part D of your brief, it pretty well suggests to the BIA, you don't need to send this back to the IJ. Just decide this. Why is it now I should send it back when you won't even argue that to the BIA? No, Your Honor. I believe under Brazilian end regulation, it was the duty of the board to send it back. You didn't argue for them to send it back. You said decide it. In fact, if I read your language here, it will say you don't need to send it back at all. You can decide this based on cases, the Ninth Circuit, Harsha, Hartooni, I don't say these right, Avitova, Elisava, all of these cases you said just decide it. No, Your Honor. We've argued this favor group analysis because this was not argued, was not addressed at all by the IJ. But you didn't say send it back to the IJ. You said just decide it. Now you're arguing to me. Oh, boy, you can't do what the BIA did here. You've got to send that back to the IJ. Why didn't you make that argument to the BIA? I did not make that argument to the BIA because it was the duty of the board under Brazilian end regulation that if they cannot resolve an appeal and they have to engage in fact-finding, that it was duty of the board to resend it back to the IJ. Well, if you'd have said that then, they might have done it. But they decided it when you didn't argue it. But they did that outside of the scope of their appellate authority, Your Honor, in doing so. I have another question. HCFR 1003 suggests that a party asserting the board cannot properly resolve an appeal without further fact-finding must file a motion for remand. I didn't see any motion for remand in the record. But, Your Honor, it also indicates if the board cannot resolve an appeal, it's the duty of the board that it must remand to the IJ if additional fact-finding is necessary. Just a minute. You didn't answer my question. Why didn't you file a motion to remand? It says right in the regulation, you've got to file a motion to remand. Well, I did not anticipate that the board would exceed its scope of its appellate authority in actually engaging in fact-finding. Well, if you're the one who's asserting that the board cannot properly resolve the appeal without further fact-finding, the regulation doesn't say, well, you can wait and see what the board's going to do. It says you must file a motion. Your Honor, I apologize for that. But I thought that when the board receives the brief and realizes that it has to engage in fact-finding and that's beyond the scope of appellate authority, that they are required by the regulation to send it back. But, Your Honor, I would like to also argue past persecution on behalf of Mrs. Giuliani, because of poor ---- It's going to be a tough time to argue past persecution if we're not ---- I mean, my worry is where did the board get to that? With respect to the past persecution, they've completely ignored, everybody ignored ---- In fact, instead addressed future persecution, and your argument here is they shouldn't have got into this because of fact-finding. No, I'm arguing past persecution that was raised before the board and it was dismissed both by the IG and by the board. The IG dismissed the attempted rape on Petitioner, claiming it was just a flashing incident. They completely disregarded Petitioner testimony in her declaration and in court and to her psychologist that there was an attempted rape, that they used physical force on her, and she has been subjected to sexual groping of her private parts for years that brought trauma and severe depression. Have you read the case Vitug v. Holder? No, I'm not ---- V-I-T-U-G v. Holder. It's a 2013 case. No, Your Honor. I'm not familiar with this case. Well, I won't ask you about that because that case says the BIA has interpreted questions of law to include not only pure questions of law, but also the application of a particular standard of law to a set of facts. For example, whether the facts established by the alien amount to past persecution or a well-founded fear of future persecution. So it seems to me that this case dead on point says if the facts are in the record and they don't go outside the record, then they've got perfect authority to do whatever they want to do. But they went outside the record in this. Where did they go outside? First of all, What new fact did they bring up? They bring up that there was no worsening condition for Christian. This is a fact that was not found by the IJ. Also, they made a finding that she did not suffer a physical harm, a fact belied by the judge that she was subject to constant touching and groping. They also made a finding that she did not present any evidence that her threats are different from other ethnic Chinese in Indonesia. This is another fact that was not. So they completely made additional fact-finding, which is beyond the scope of their appellate authority under both Sredor and Kaplan. And I believe I'm out of time for my rebuttal. Thank you. Good morning, and may it please the Court. My name is Paul Stone. I represent the Respondent, Attorney General of the United States. The issue of fact does not. The issue of fact in this case that is disputed is whether or not the report from her medical expert, in fact, explains the almost four-year delay. Both the board and the immigration judge found that the report didn't do so. She maintains on petitioner review that it does. Looking at the report, the language actually is that Ms. Giuliani's experiences, PTSD and depression, may have contributed to her failure to file within one year. Very well may. Very well may, Your Honor. So at best, the report explains the failure to file within one year of her arrival. But there's no coherent, clear explanation for the delay after that. So even if the Court were to review it for substantial evidence, although it's a factual dispute. Let me ask you about that. IJ appears to have credited Dr. Wenzel's declaration and mental health assessment here, but seems to have also maybe ignored her statement that petitioner's mental state at the time she arrived in the United States probably caused her delay. How do we address that discrepancy here? Well, Your Honor, the problem is not that it may have caused a delay in filing it. The question is whether it reasonably explained the five-year delay in filing it after she arrived, which was almost four years after it was, in fact, due. So it's not really a discrepancy, but that is also the immigration judge's job to weigh the evidence. Even if the immigration judge finds an alien's testimony credible or an expert's declaration credible, the immigration judge, as the trier of facts, still has the duty to weigh, consider the evidence, not just determine if it's credible, but as the statute says, credible and persuasive. I'm sorry, the standards. So in this case, the immigration judge may not have found it as persuasive on that point, even if the immigration judge found it credible. Let's talk about the possible impermissible fact-finding that may have occurred here. Even if the petitioner didn't ask for a remand at the time it should have or highlight this earlier and objected to it going back, does that excuse or justify or I don't know what the right word is here, that the BIA could violate its own regulations? I mean, because under its own regulations, the BIA operating its appellate function may not make factual findings in the course of deciding appeal, and I'm citing 8 CFR section 1003 1D3. Shouldn't that supersede whatever the petitioner requested? Your Honor, it would not excuse the board exceeding its authority, but it also would not preserve the issue for petition for review, which would be a separate issue from the board actually exceeding its authority. But in this case, the board did not exceed its authority. The board adopted the findings of fact made by the immigration judge. For example, the immigration judge considered her claims of past persecution as impacting her objectively reasonable fear of future persecution, weighed some more heavily than others. Some that Giuliani testified were not significant. The immigration judge found to be less persuasive. The board affirmed that and then applied to this Court's decisions in Salem Lockery and the findings this Court made in determining whether the legal standard for an objectively reasonable fear of future persecution had been met. That is within the board's authority. Well, where did it make the factual findings necessary, the IJ, regarding the disfavored group analysis? I know the found petitioner had not established a pattern or practice of persecution of Christians or Chinese Christians in Indonesia, but I don't believe the IJ went the step further in determining whether the group to which the petitioner belonged was a disfavored group under seal or Lockery. Can you point to me where that happened? No. In this case, the immigration judge did not do that because at that point Lockery had not come out and Salem wasn't clear that it applied for more than Salem. Right. So there was no factual finding by the IJ. The BIA had to make that factual or made that factual determination, and they're precluded to do so under the regs. Well, Your Honor, I think I understand where you're going with that. The problem here is the fact that she's a Chinese Christian has never been disputed, and as a Chinese Christian under Salem and Lockery, as a matter of law, she's part of a disfavored group. And the only way that could be overcome is if the DHS had introduced evidence that conditions had changed so dramatically that Chinese Christians are no longer disfavored groups. Then it would become an issue of fact, whether that Salem and Lockery were no longer good law and that facts on the ground had changed. But that was never disputed. It's a straight-up matter of applying undisputed facts to the standard. Even if we say that's not disputed, there's an individualized risk aspect. I'm not sure that the disfavored group still wouldn't have to be somehow established by the IJ below. Well, how about the individualized risk? There's no assessment by the IJ that there was an individualized risk. And I understand that Salem and Lockery came down afterwards, but still the question is what happens when you have law that comes later after they've had this. It seems like there is an argument to be made. If this is a fact-finding function, that it would go back to the IJ. Well, Your Honor, it's because the findings of fact, the immigration judge made the finding of fact that she didn't have an objectively reasonable fear of future persecution. And the definition of that is that the alien has an individualized risk. So even though the immigration judge. I'm sorry, I didn't understand that. Say that again. One of the elements for withholding an asylum is that the alien had an objectively reasonable fear of persecution. And that's the ground that the immigration judge rested the decision on. But he didn't make any findings of fact regarding that. The immigration judge recounted the claims of the alien and then found that those weren't sufficient to show the standard for withholding. And the standard for withholding is an objective and subjective fear of persecution. Her testimony was found credible, so she satisfied the subjective standard. And so the only remaining question is whether she had an objective fear of persecution, which is the basis of the immigration judge's decision. And that means that she did not show that she had an individualized risk of persecution. That individualized risk question applies to anyone, whether they're a part of a disabled group or not. You're saying that the IJ somewhere in this record, if you can just point it to me, made an assessment regarding the disabled group and the individualized risk like a specific factual assessment. Well, Your Honor, as I said, the immigration judge did not make the disabled group finding. But on page 47 of the record, the immigration holds that even assuming that all were true, the court finds that she has failed, Giuliani has failed to establish the standard for withholding and will deny that application as well. And as I said, the standard for withholding includes the objective and subjective component. The immigration judge found her credible. Therefore, the objective component was satisfied. The subjective component was satisfied. The question is the objective component. I understand your argument. It seems to me like what you're saying is that the IJ found the facts, and the facts are in the record, and that the only thing that the BIA did was apply the law that came down in the new cases to those facts, and that that is not a fact-finding analysis that we ought to remand back on. Is that what you're suggesting? That's correct, Your Honor. Well, let me tell you just a little bit what I worry about on that. The BIA didn't adopt the IJ's decision, right, as to this withholding and removal, and future persecution. They adopted another. In fact, it seemed to me that they were, because they did not adopt their decision, we're left with the BIA's decision to review. And then when I read the BIA's decision, I says, well, we're left to decide what they did. And here's what they say. Here's what we have as our law. For the BIA relies on the IJ's opinion as a statement of reasons, the court can look to the IJ's decision as a guide to what lay behind the BIA's conclusion. But here, the IJ didn't decide this issue. And so we're left to speculate as to whether the BIA considered all of the facts that the IJ had in front of them. And when I read what the BIA said, I can't determine whether they looked at all those facts or not. All I can see is that they found that, given a new standard of review, that they still were going to go the same way. But I really can't tell whether they looked at each one of those facts. Well, Your Honor, the court is permitted, even when the board doesn't explicitly adopt the language in the immigration judge's decisions, it can look behind the board's decision to see the basis. For example, here the board says, we agree with the immigration judge that the record does not support the respondent's claim that she more likely than not will face persecution if returned to Indonesia. That's where the board adopted the immigration judge's findings. And then it went on. But just a minute. You would agree with me, wouldn't you, that this new standard that we're to apply is a lesser standard than would have had to be applied for withholding of persecution that the IJ applied? You would agree with that, wouldn't you? When you look at what we're really looking at as to whether she was particularly subject to these conditions, it's a lesser standard? That's correct, Your Honor. So if, in fact, the only thing I can find is that the IJ found no fear of future persecution on the higher standard, how can I suggest, by reading the BIA decision, that they considered all the facts that the IJ had in front of them in determining that decision? Well, it was that sentence I cited from the board, and then the board took that and took the findings that this court made in Sale and Walkery and determined whether or not they together met the legal standard for withholding of removal. So it's that application of the facts from Sale and from an immigration judge's decision that did not exceed the board's authority. But I don't know what facts the BIA used in making that application, except to suggest that they, I mean, they didn't take the IJ's application of the facts, so I don't know what facts they appropriately used to make it, do I? Well, yes, Your Honor. You can look behind the board's decision to the immigration judge's decision, which the board agreed with when it held that the record doesn't support the claim that she would face persecution if she returned to Indonesia. So you can, Your Honor, look past the board decision at the immigration judge's decision to ascertain those facts, which is why the board doesn't necessarily re-recite the facts in every decision like that. Do you have more questions? No. I think what we're grappling with, at least what I grappled with in this situation, counsel, is that it wouldn't be the normal for us to suggest that the trier of fact applying the law to the facts is a question of law. It would be a question of fact. And therefore, being a question of fact, it's a tough time for me to suggest that then what the BIA did here is a question of law, which they ought to be able to do. Now, I realize the BIA has a little bit different, if you will, job than does the normal district judge in these kind of situations or any other particular judge or trial court. But that's the thing that's worrisome, and I think that was the thing that was worrisome to my colleague. We've got a decision that says somebody is absolutely a disfavored group, and that was a matter of law. But then the second part, we have no decision telling us, and it is an application of that standard to facts in the record that make it difficult to suggest that that ought to be something the BIA ought to do. Right. That's what I'm trying to get you to respond to. I mean, that's Judge Murgia, I think's question, and that's mine, especially when they didn't even explain what facts they used. Well, Your Honor, in Palifax, this court did say that the board had the authority to apply facts to the legal standard. In that case, it was, I think, for a particularly serious crime to determine whether the alien had been convicted of one. Hwang, the Third Circuit, followed its prior case and said that same thing, the board could apply the facts to a standard of law, which is what we argue the board did here. You're correct, the board didn't list all the facts behind its decision, but in this case, the court can look behind the decision, the immigration judge's decision, and see the facts there. Had the board not relied on those, the board would have had to reverse them, finding under the more deferential standard review. Well, you raised Palifax, and that question presented there was whether a crime of conviction is a particularly serious one under the applicable statute, and that's clearly, I think, a question of law. What we're dealing here, I think, is one step removed from that, and I'm just having trouble trying to figure out what, I mean, what your best argument is as to why this wasn't just a factual determination, because if it was a factual determination on the individualized risk, it seems like the BIA may have exceeded its authority, and that an I.J. should have had the opportunity to review this. But that's why I joined Judge Smith in the questioning here. Well, Your Honor, the next case. Are you the lawyer in the next case? Yes, Your Honor. Well, we'll be back. Okay. Do you have something to say about Palifax? Same stuff. Well, she ran out of time. Are you the lawyer? I can't remember. I'm the lawyer in the second case. You're the lawyer in the second case. Well, I think we'll submit this case. This is Case 10-71547, Giuliani v. Holder, and it is submitted. We will now move to the next case, which is Case 10-73213, Malik v. Holder, and we'll hear from counsel again.
judges: McNamee, Smith, Murguia